UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE HERSHEY COMPANY and
HERSHEY CHOCOLATE & CONFECTIONARY
CORPORATION,

                    Plaintiff(s),            CASE NUMBER: 08-14463
                                             HONORABLE VICTORIA A. ROBERTS

v.

ART VAN FURNITURE, INC.,

                    Defendant(s).
_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, IN PART, AND DENYING PLAINTIFF'S MOTION IN PART

## I.    INTRODUCTION

       Plaintiff filed suit against Defendant, alleging trademark infringement under 15 U.S.C. § 1114(1), false association, sponsorship and approval pursuant to15 U.S.C. § 1125(a)(1)(A), trademark dilution by blurring (Plaintiff's brief suggests a claim based on dilution by tarnishment, but counsel for Plaintiff corrected this during oral argument) according to 15 U.S.C. § 1125(c), unfair competition under 15 U.S.C. § 1125(a), and common law conversion.  Plaintiff also filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction.  The Court heard oral arguments on Plaintiff's Motion on October 23, 2008.

       For the reasons stated, the Court **GRANTS** Plaintiff's request, but only with respect to its dilution by blurring claim.

## II.  BACKGROUND

Plaintiff is a well-known maker of chocolate and confectionery goods, whose products are distributed and sold the world over.  Defendant is Michigan's largest furniture retailer, operating 30 stores (all in-state), a website where customers may buy products online, and a fleet of about two dozen trucks for customer deliveries.  The issue before the Court concerns Defendant's decoration of its delivery trucks.

On October 10, 2008, Defendant launched an advertising campaign.  It posted ten truck decorations on its website and invited visitors to vote for their favorite design with a chance to win a $50 gas card.  Defendant also announced that the winning design would be emblazoned on every one of its delivery trucks.  At oral argument, however, Defendant stated it plans to delay redecorating its trucks pending the result of this case.  The voting period ends October 31, 2008.

The first design on the contest page of Defendant's website is an image of a brown sofa emerging from a red and/or burgundy wrapper reminiscent of a candy bar.  This "couch bar" is designed to bring to mind a candy or a chocolate bar, with its packaging torn open and mouth-watering contents exposed.  Emblazoned across the wrapper are the words "ART VAN," spelled in white, block lettering, and on the bottom left of the wrapper, in smaller type, "Since 1959."  On the right side of the image, where the sofa juts from the "candy bar," the torn wrapper has the appearance of crackled and ripped tinfoil.  On the left, the same silver-colored foil is visible, protruding beneath the red and white wrapper.

Plaintiff contends that Defendant's design truck is an unauthorized and deliberate infringement of its trademarks and trade dress.  Plaintiff claims that its trademark and

trade dress packaging include:

1. a rectangular design;
2. silver, stylized lettering;
3. a brownish-maroon colored wrapper;
4. the name "Hershey's;" and
5. silver foil protruding from under the wrapper along the edges of the bar.

Plaintiff claims that Defendant's "couch bar" design is unauthorized and infringes upon its registered and non-registered trademarks and trade dress, and that Defendant is trading on Plaintiff's goodwill and reputation to advertise, distribute and sell its products. Plaintiff charges that the "couch bar"'s resemblance to Hershey's famous chocolate candy bar is intentional, and that Defendant initially sought to purchase a license from Plaintiff to use this design, which request Plaintiff denied. Plaintiff further alleges that Defendant operates at least one truck with the "couch bar" design; Defendant denied this during oral argument. Defendant also disputes the suggestion that it requested a license to use Plaintiff's trade dress; rather, Defendant claims that it only offered to purchase the license after Plaintiff expressed concern about the truck design, as a way to resolve the controversy. Finally, Defendant's spokeswoman Chris Morrisroe is quoted as saying, in response to newspaper inquiries about this lawsuit: "It [the "couch bar"] is getting the number one vote."

Plaintiff requests that the Court enter a temporary restraining order enjoining Defendant from: (1) infringing on any of Plaintiff's trademarks or trade dresses; (2) manufacturing, advertising or promoting any products or services using Plaintiff's trademarks or trade dress; and (3) engaging in a host of other potentially infringing acts.

### III.    ANALYSIS

The Court must determine whether Plaintiff meets its burden for issuance of a Temporary Restraining Order.  When deciding such motions, a district court must consider: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the relief; (3) whether granting the order will cause substantial harm to others; and (4) whether granting the order will serve the public interest.  *Summit County Democratic Central & Executive Committee v. Blackwell,* 388 F.3d 547, 550-51 (6th Cir. 2004); *see also Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), *cert. denied*, 526 U.S. 1087 (1999).  No single factor is dispositive; rather, the court must balance them and determine whether they weigh in favor of an injunction.  *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).

### A.    Likelihood of Success on Merits - Trademark Infringement Claim

Plaintiff argues that Defendant infringed its trademarks and trade dress, and that these violations will only get worse if Defendant is allowed to proceed with its contest and truck decorating plan.

"A trademark is defined in 15 U.S.C. § 1127 as including 'any word, name, symbol, or device or any combination thereof" used by any person 'to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.' In order to be registered, a mark must be capable of distinguishing the applicant's goods from those of others."  *Two Pesos v. Taco Cabana*, 505 U.S. 763, 769 (1992).  By

comparison, "[t]he 'trade dress' of a product is essentially its total image and overall appearance . . . and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.* at 765 n.1 (internal quotations omitted).  As the Second Circuit explains,

> [t]rade dresses often utilize commonly used lettering styles, geometric shapes, or colors, or incorporate descriptive elements, such as an illustration of the sun on a bottle of suntan lotion. While each of these elements, individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness.

*Paddington Corp. v. Attiki Importers & Distributors Inc.*, 996 F.2d 577, 584 (2nd Cir. 1993).

Because these claims involve both registered and unregistered trademarks, and because these marks combine to form Plaintiff's overall trade dress, the Court analyzes them together, rather than as distinct elements.

The Lanham Act, as the statute regrouping federal trademark laws is known, states: "Any person who shall, without the consent of the registrant--

> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant . . ."  15 U.S.C. § 1114(1).

To succeed on a Lanham Act trade dress infringement claim, a plaintiff must prove that "the allegedly misappropriated features of the dress (1) are inherently distinctive or have acquired distinction by virtue of secondary meaning in the marketplace; (2) are not functional; and (3) create a likelihood of confusion as to the source of defendant's goods." *Mexican Food Specialties v. Festida Foods, Ltd.*, 953 F. Supp. 846, 849 (E.D. Mich. 1997) (*citing Windmill Corp. v. Kelly Foods Corp.*, Nos. 94-5874/94-5890, 95-5137, 1996 U.S. App. LEXIS 3473, at *9 (6th Cir. Jan. 26, 1996)).

### 1.    Plaintiff's Trademarks and Trade Dress are Distinctive

The defining characteristic of a trademark, which is also the requirement to apply for registration, is its "distinctiveness," or ability to distinguish from others the product to which it is affixed. *Two Pesos*, 505 U.S. at 768.  In *Abercrombie & Fitch Co. v. Hunting World, Inc.*, Judge Friendly defined the classic distinctiveness scale, which separates marks into categories – (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful – based on their distinctive character.  537 F.2d 4, 9 (2d. Cir. 1976).  A mark can be inherently distinctive, like those in categories three, four and five.  If it falls in the first two categories, the mark must acquire this trait in the marketplace, by developing a "second meaning." *Two Pesos*, 505 U.S. at 769.

A mark that is not inherently distinctive acquires this trait when it "develop[s] secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Wal-Mart Stores, Inc., v. Samara Brothers, Inc.*, 529 U.S. 205, 211 (2000) (*quoting Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n.11 (1982)).  The Sixth Circuit's secondary meaning analysis evaluates seven factors

to determine whether a trademark or trade dress has acquired distinctiveness:

> (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying.

*DeGidio v. West Group Corp.*, 355 F.3d 506, 513 (6th Cir. 2004) (*citing Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 937 (6th Cir. 1999), *rev'd on other grounds*, 532 U.S. 23 (2001)).  "Secondary meaning is established when a preponderance of the evidence demonstrates 'that the attitude of the consuming public toward the mark denotes a single thing coming from a single source.'" *Id.* (*quoting Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) (other internal quotes omitted)).

The Court finds that Plaintiff's chocolate bar trade dress has acquired a secondary meaning that entitles it to federal trademark protection.  Federal law recognizes as prima facie evidence of distinctiveness, the fact that a mark or trade dress has been used in commerce, for a minimum of five years, and in a manner both substantially exclusive and continuous.  15 U.S.C. § 1052(f).  At oral argument, counsel for Plaintiff represented that this chocolate bar has had the same trade dress for decades, and that it is distributed and sold around the world.  Counsel further submitted that Plaintiff spends millions of dollars annually to advertise and consolidate its brand, and that it is one of the most recognizable and best selling confectionery products in the United States.  The Court also takes notice that Plaintiff's candy bar is often described as an "American Icon" on the same plane as Coca-Cola, for example.  *See, e.g., Dennis R. Hall & Susan Grove Hall, eds., American Icons: An Encyclopedia of the People,*

*Places, and Things that Have Shaped Our Culture* 336-42 (2006).

Because Plaintiff's trade dress satisfies the requirements of the secondary meaning analysis, the Court need not decide if it is inherently distinctive.

### 2.    Plaintiff's Trade Dress is Not Functional

The party seeking to protect a particular trade dress bears the burden of proving the trade dress is not functional.  15 U.S.C. § 1125(a)(3).  A trade dress is deemed functional if it is so inherently essential to the product's use or purpose that, were it to be protected, other manufacturers would be unable to compete effectively in the market for the product.  *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 642 (6th Cir. 2002).  A functional product design may not be protected as a trade dress.  *TrafFix Devices v. Marketing Displays*, 532 U.S. 23, 29 (2001).

The discrete characteristics of Plaintiff's trade dress are not inherently essential to the use or purpose of a chocolate bar.  Likewise, a person seeking to conjure the image of a chocolate bar can use an infinity of color, font and design combinations without replicating Plaintiff's trade dress.  Thus, Plaintiff satisfies its burden to prove its trade dress is not functional.

### 3.    There is Limited Likelihood of Confusion

When determining whether an alleged infringement is likely to cause confusion, the Sixth Circuit requires district courts to examine and weigh several factors, including:

1. the strength of the plaintiff's trade mark or trade dress;
2. the relatedness of the goods or services;
3. the similarity of the trademarks or trade dresses;
4. evidence of actual confusion;
5. the marketing channels used;

8

6. the degree of purchaser care;
7. the defendant's intent in selecting the trademark or trade dress; and
8. the likelihood of expansion of the product or service lines.

*Abercrombie & Fitch*, 280 F.3d at 646; *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759

F.2d 1261, 1264 (6th Cir. 1985). The same factors apply whether the alleged

infringement relates to trademark or trade dress. *Gray v. Meijer, Inc.*, 295 F.3d 641,

645 (6th Cir. 2002). "[A] plaintiff need not show that all, or even most, of the factors

listed are present in any particular case to be successful." *Wynn Oil Co. v. Thomas*

*(Wynn I)*, 839 F.2d 1183, 1186 (6th Cir.1988). The Sixth Circuit explains:

> these factors imply no mathematical precision, but are simply a guide to
> help determine whether confusion is likely. They are also interrelated in
> effect. Each case presents its own complex set of circumstances and not
> all of these factors may be particularly helpful in any given case. But a
> thorough and analytical treatment must nevertheless be attempted. *The*
> *ultimate question remains whether relevant consumers are likely to believe*
> *that the products or services offered by the parties are affiliated in some*
> *way*.

*Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1107 (6th

Cir. 1991) (footnote omitted) (emphasis added).

### a.  Strength of Plaintiff's Trade Mark and Trade Dress

The strength of a trademark or trade dress bears a direct relationship to its

distinctiveness. In fact, courts are to consider the same factors. *See Champions Golf*

*Club v. Champions Golf Club*, 78 F.3d 1111, 1117 (6th Cir. 1996); *Mexican Food*

*Specialties*, 953 F. Supp. at 851.

> The strength of a mark is a factual determination of the marks
> distinctiveness. The more distinct a mark, the more likely is the confusion
> resulting from its infringement, and, therefore, the more protection it is
> due. . . . "A mark is strong if it is highly distinctive, i.e., if the public readily
> accepts it as the hallmark of a particular source; it can become so

because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both."

*Frisch's Restaurant*, 759 F.2d at 1264 (*quoting Callmann, Unfair Competition,*

*Trademarks, and Monopolies*, ¶ 20.43 (4th ed. 1983)).

Plaintiff states that its trademark and trade dress have appeared on its products in substantially the same form for over a century, to the point that they are immediately recognizable. Defendant counters that Plaintiff's trade dress is famous only if it includes the name "Hershey's;" without it, Defendant contends, Plaintiff's trade dress is much weaker, as the plethora of brown-colored, rectangular-shaped candy bars on the market indicates. (*See* Def.'s Opp'n Ex. C.)

Defendant's argument ignores the fundamental nature of a trade dress. In the language of the Supreme Court, the trade dress of a product is the result of "its total image and overall appearance," not one or more isolated elements of its packaging. *Two Pesos*, 505 U.S. at 765 n.1. Here, the strength of Plaintiff's trade dress comes from the combination of its features and its historical presence in the marketplace, strengthened by decades of advertising.

There is no doubt that Plaintiff's trade dress is both "highly distinctive" and "widely accepted as the hallmark" of Hershey's chocolates; this factor strongly suggests a likelihood of confusion.

### b. Relatedness of Goods or Services

As the Sixth Circuit explains,

This factor admits of three possible scenarios: (1) cases in which the services of the parties are in direct competition, "in which case confusion is likely if the marks are sufficiently similar"; (2) cases in which the "services are somewhat related but not competitive, so that likelihood of

10

confusion may or may not result depending on other factors"; and (3) cases in which the "services are totally unrelated, in which case confusion is unlikely." Services "are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company."

*Champions Golf Club*, 78 F.3d at 1118 (*quoting Homeowners*, 931 F.2d at 1108).

Plaintiff produces and markets chocolate and confectionery items, while Defendant is a retailer of furniture and home furnishings. This basic difference notwithstanding, Plaintiff argues that it licenses its trademarks and trade dress in "various items for use in the home, such as bedding ensembles featuring the Hershey's brand." (Pl.'s Reply Supp. Mot. 5.) At oral argument, counsel for Plaintiff also mentioned Hershey's brand pillows, and pillows in the shape of Hershey's Kisses. These statements aside, Plaintiff has not supplied any evidence of licensing for home furnishings, or of the breadth of its licensing activities in this field.

To the extent that Plaintiff suggests that the parties' products or services are in direct competition, no evidence currently before the Court supports this. As to whether these products or services might be "somewhat related," such that other factors might result in confusion, Plaintiff has not submitted evidence that it licenses its trademark or trade dress to furniture makers, retailers, or in ways that could lead buyers to think Art Van's operations are "somehow connected with or sponsored by" Plaintiff. Unless such evidence is presented, this case will likely fall in the "totally unrelated" category, with a minimal chance of confusion on this factor.

### c.    Similarity of the Trademarks or Trade Dresses

The similarity of trademarks, or trade dresses, is a factor of "considerable weight."  *General Motors Corp. v. Keystone Automobile Industries, Inc.*, 453 F.3d 351, 356 (6th Cir. 2006); *Daddy's Junky Music Stores v. Big Daddy's Family Music Center*, 109 F.3d 275, 283 (6th Cir. 1997).  The proper test of similarity is not "side-by-side comparison," but "whether the mark 'will be confusing to the public when singly presented.'"  *Wynn I*, 839 F.2d at 1188 (*quoting Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983)).  However, courts often begin by comparing the trademarks or trade dresses at issue, and this is where our analysis starts as well. *See, e.g. Mexican Food Specialties*, 953 F. Supp. at 851-52.

There is no question that Defendant's "couch bar" bears a resemblance to a Hershey's chocolate bar, particularly to Plaintiff's "Special Dark" bar.  One feature in particular is identical in both designs: each wrapper is composed of two distinct elements, a silver foil containing the actual product, and a slightly narrower "sleeve" inscribed with the company name.  Because the sleeve is not as wide as the product itself, the foil visibly protrudes along the edges of the candy bar.

Other aspects of the "couch bar" also evoke Hershey's candy bars, but in a more subtle way.  For instance, the words "HERSHEY'S" and  "ART VAN" are both printed in stylized block lettering; however, their font, color and positioning are different: the letters on Plaintiff's iconic chocolate bar are silver and occupy the upper half of the wrapper, whereas Defendant's letters are white and sit squarely in the middle.

One aspect of Defendant's design seems entirely different from Plaintiff's trade dress: Plaintiff's famous bar is wrapped in brown paper, while Defendant's "couch bar"

emerges from a sleeve that appears to be burgundy. However, at oral argument, counsel for Plaintiff exhibited its "Special Dark" bar, with a wrapper divided roughly between brown and a similar shade of red or burgundy.

Finally, other similarities are so generic that their impact on the overall analysis is minimal: both designs are indeed, as Plaintiff points out, rectangular in shape, but the relevance of this observation is limited, since most candy bars share this characteristic. Likewise, Defendant's brown-colored sofa evokes chocolate in general, not Plaintiff's chocolate, much less Plaintiff's trademark or trade dress.

Cognizant of the fact that "[t]he appearance of the litigated marks side by side in the courtroom does not accurately portray market conditions," the Court now considers the likelihood that, when viewed alone, Defendant's design could be confusing to the public. *Daddy's Junky Music Stores*, 109 F.3d at 283 (*quoting Homeowners*, 931 F.2d at 1106). This is necessary to "account for the possibility that sufficiently similar marks 'may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark.'" *Id.* (*quoting Wynn I*, 839 F.2d at 1188) (other internal quotations omitted).

One way to attempt to reproduce market conditions is to consider whether a person glimpsing Defendant's truck on the roadway would associate it with Plaintiff's brand, trademark or company. The Court finds this scenario unlikely. First, the words "Art Van" are difficult to confuse with "Hershey's;" they do not sound the same or bear the same meaning. One evokes a famous brand of food products, the other a brand of furniture stores within Michigan. *See Wynn I*, 839 F.2d at 1188 (holding that the use of similar words or names on different products enhances the risk of confusion); *Mexican*

13

*Food Specialties*, 953 F. Supp. at 851-52 (same).  Furthermore, the features a viewer is most likely to notice about Defendant's design are those which least resemble Plaintiff's trade dress: the candy wrapper's color, the brand name, and the fact that the object emerging from the wrapper is a sofa, not a bar of chocolate.

As for the feature which most directly evokes Plaintiff's trade dress, the silver "foil" along the edge of the wrapper, while it contributes to the overall illusion of the "couch bar," it is not one which so overwhelms the viewer that it immediately conjures up Plaintiff's chocolate bar.

On balance, the Court finds that consumers who have but a "general vague, or even hazy, impression or recollection" of Plaintiff' trademark and trade dress are unlikely to confuse Defendant's "couch bar" with Plaintiff's iconic chocolate bar.

### d.    Evidence of Actual Confusion

"Courts have consistently held that 'evidence of actual confusion is undoubtedly the best evidence of a likelihood of future confusion.'" *Champions Golf Club*, 78 F.3d at 1119 (*quoting Wynn Oil Co. v. American Way Serv. Corp. (Wynn II)*, 943 F.2d 595, 601 (6th Cir. 1991).  However, evidence of actual confusion is by nature difficult to produce, and consequently it is "frequently discounted as unclear or insubstantial." *Wynn I*, 839 F.2d at 1188 (*quoting Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 914 (Fed. Cir. 1984).  Accordingly, courts weigh this factor more heavily when evidence of confusion exists, but less so when there is no such evidence.  *Id.* ("[T]his factor is weighted heavily *only* when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available") (emphasis added).

Plaintiff admits that there has been no evidence of customer confusion so far, but points to one newspaper article which, in describing Defendant's online competition, refers to "fun, eye-catching images -- such as a chocolate covered sofa partially wrapped liked a Hershey bar." (Compl. Ex. B.) Plaintiff submits that, if confusion has not yet occurred, it is likely to manifest itself eventually. By itself, a newspaper article noting a resemblance between Defendant's truck design and Plaintiff's trade dress is not evidence of consumer confusion. *See Champions Golf Club*, 78 F.3d at 1120 ("Four incidents is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion").

This factor weighs modestly against protection.

### e.     Marketing Channels Used

"This factor . . . consists of considerations of how and to whom the respective goods or services of the parties are sold." *Homeowners*, 931 F.2d at 1110. It requires the Court to analyze "(1) whether the parties use the same means to market the product, and (2) whether the 'predominant customers' are the same." *General Motors*, 453 F.3d at 357 (*quoting Daddy's Junky Music Stores*, 109 F.3d at 285). As the Sixth Circuit explains,

> dissimilarities between the predominant customers of a plaintiff's and defendant's goods or services lessens the possibility of confusion, mistake, or deception. Likewise if the services of one party are sold through different marketing media in a different marketing context than those of another seller, the likelihood that either group of buyers will be confused by similar service marks is much lower than if both parties sell their services through the same channels of trade.

*Homeowners*, 931 F.2d at 1110.

15

Defendant states that its furniture products and related services are exclusively available through its thirty Michigan stores and its website, and that it does not sell any candy at its stores.  As for Plaintiff, its chocolate and confectionary goods are widely distributed in "a variety of retail channels including mass merchandisers and club, grocery, drug, convenience and mom and pop stores."  (Compl. ¶ 19.)  However, Plaintiff argues that, like Defendant, it employs creative ways to reach its public, and thus, "[i]t is likely that consumers . . . would view the advertisement as another example of [Hershey's] creative advertising."  (Pl.'s Br. Supp. Mot. 13.)

The differences between the parties marketing channels far outweigh their similarities.  First, although both rely heavily (or exclusively, in Defendant's case) on retail to reach their customers, their products are not available in the same stores.  Additionally, while both parties cater to the general public, there is no indication that their customers are "predominantly" the same.  Even if their customer bases overlap to some extent – an inevitable result when one party is an internationally renowned brand – the risk of consumers confusing a furniture outlet with a candy store, or vice-versa, appears remote.  Finally, notwithstanding Plaintiff's undeniable creativity in marketing, it seems far-fetched to suggest that the cleverness of this truck design will cause viewers automatically to associate it with Hershey's.

This factor weighs against the likelihood of confusion.

### f.    Degree of Purchaser Care

This factor requires the Court to consider both the types of products at issue, and the typical purchaser's degree of sophistication.  *General Motors*, 453 F.3d at 357.  In the Sixth Circuit, the principal source of guidance on this factor comes from *Homeowners*:

> Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution.  However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper.  Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases.  When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

931 F.2d at 1111.

Plaintiff argues that consumers accessing Defendant's website are unlikely to "exercise significant discretion in reviewing the product offering," and suggests that the same is true of those who observe Defendant's truck on the street because they "are not actually buying the truck at issue."  (Pl.'s Br. Supp. Mot. 13.)  Defendant responds that the image on its website is surrounded by hundreds of references to furniture.  Defendant also emphasizes the differences between purchasing candy and furniture.

It is difficult to compare the act of buying candy bars to that of shopping for furniture.  Candy may be purchased from a variety of different locations, from convenience stores to supermarkets, from newspaper stands to pharmacies; in fact, it is often displayed in the checkout aisles of supermarkets, the location reserved for "impulse purchases."  By contrast, furniture is generally sold in specialized stores.  According to Defendant, its furniture is available only at its dedicated showrooms or on

17

its website.  Another difference is that a candy bar seldom sells for more that three

dollars, whereas furniture items often cost several hundred, increasing the likelihood

that a consumer will exercise a greater level of care, whether buying furniture online or

at a brick-and-mortar store.  Similarly, consumers are generally unlikely to spend more

than a few dollars on any single candy purchase.  On the other hand, buying furniture is,

more often than not, a considerable expense, one for which consumers can be

expected to apply a higher degree of discretion.  Finally, it is reasonable to surmise that

most consumers buy candy more often, if not much more often, than they buy furniture;

in turn, this supports an inference that furniture buyers will tend to apply a heightened

standard of care to their purchases, comparing brands, styles, fabrics and designs.

  The different nature of Plaintiff's and Defendant's products, combined with the

contrasting levels of care their purchase is likely to induce, supports the conclusion that

a consumer is unlikely to believe that, in purchasing Defendant's furniture, s/he is

actually buying a product either affiliated with, licensed or endorsed by Plaintiff.

  **g. Defendant's Intent in Selecting the Trademark or Trade Dress**

  A defendant's intent in infringement cases is often difficult to assess, yet it can be

a deciding factor in this analysis.  The Lanham Act does not require proof of intent, and

some courts consider a defendant's intentions "largely irrelevant" to whether consumers

will be confused by the resulting trademark or trade dress.  *Wynn I*, 839 F.2d at 1189

(*quoting Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.

1986)).  Nevertheless, the Sixth Circuit considers intent a relevant factor, because

  purposeful copying indicates that the alleged infringer, who has at least as
  much knowledge as the trier of fact regarding the likelihood of confusion,

believes that his copying may divert some business from the senior user. *General Motors*, 453 F.3d at 357; *Daddy's Junky Music Stores*, 109 F.3d at 286.

Intent is a critical factor: if a court finds that a defendant chose a mark with the intent of causing confusion or deriving a benefit from the plaintiff's reputation or goodwill, "that fact alone may be sufficient to justify an inference of confusing similarity." *Audi AG v. D'Amato*, 469 F.3d 534, 544 (6th Cir. 2006); *Frisch's Restaurants v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir. 1982); *see also Jordache Enterprises v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987) ("The proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff"). On the other hand, absent a showing of intent, the defendant's intentions are irrelevant. *Wynn I*, 839 F.2d at 1189 (*citing Lois Sportswear*, 799 F.2d at 875). While acknowledging the importance of intent, some courts caution that,

> [e]vidence of intent to copy does not create a rebuttable presumption of likelihood of confusion, thereby shifting the burden to the defendant . . . Instead, the intent of the alleged infringer remains but one factor in our analysis. A finding that the infringer intended to copy may lead to an inference of confusion, even a strong inference, but the inference is a permissive one.

*John Allan Co. v. Craig Allen Co., L.L.C.*, 540 F.3d 1133, 1139 n.4 (10th Cir. 2008) (citing cases).

Determining intent is a fact-intensive pursuit which may be proven either by direct or circumstantial evidence. *Champions Golf Club*, 78 F.3d at 1121; *Wynn II*, 943 F.2d at 603. By itself, "use of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement." *Id.* Moreover, "extensive advertising and long-term use of a protected mark can create a presumption that the alleged

infringer knew of the protected mark." *Daddy's Junky Music Stores*, 109 F.3d at 286

(*citing Wynn II*, 943 F.2d at 603-04).

Plaintiff charges that Defendant created the "couch bar" design intentionally to

trade on Plaintiff's successful and recognized brand, and cites Defendant's attempt to

buy a license as evidence. Defendant admits that it offered to purchase a license, but

insists that this was in the spirit of conciliation, not prevention, and that the offer was

made after Plaintiff informed Defendant that it was contemplating legal action.

Defendant also argues that the "couch bar" design should be viewed in the general

context of its advertising campaign, which expressly lets viewers decide which of the ten

proposed designs will adorn its trucks.

Plaintiff's products have been widely advertised for decades, which supports the

inference that, at a minimum, Defendant had prior knowledge of Plaintiff's trademark

and trade dress. Furthermore, a newspaper article cited at oral argument indicates that

in its original version, the "couch bar" wrapper was brown, not red.

> When Hershey expressed concerns about trademark infringement, Art
> Van changed the color of its chocolate bar wrapper to red, from the
> chocolate brown that Hershey uses, said Art Van spokeswoman Chris
> Morrisroe.

*Paul Egan, Hershey Sues Art Van over Trucks, Chocolate Bar Design*, Detroit News,

Oct. 21, 2008. This statement reveals not only that Defendant's initial design bore even

closer resemblance to Plaintiff's trade dress, but also that Defendant was aware of this

similarity, and of the fact that Plaintiff uses brown-colored wrapping for its candy bars.

Finally, in an e-mail exchange sent to Plaintiff's counsel before Plaintiff filed suit,

counsel for Defendant counsel refuted the notion that any infringement had occurred,

and added: "Initial response to the ad has been quite favorable to both Art Van Furniture and Hershey's, and I believe that the ad provides free advertising to Hershey's." These statements support a finding that Defendant intended its design to resemble Plaintiff's iconic candy bar.

### h. Likelihood of Expansion of the Product or Service Lines

The final factor looks ahead to whether parties who are not direct competitors are likely to become so in the future. "[A] strong possibility that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners*, 931 F.2d at 1112. This expansion may be either geographic, or as a result of an increase in products or services. *General Motors*, 453 F.3d at 356. However, absent evidence that the parties intend to significantly expand their markets, this factor does not bear upon the likelihood of confusion. *Daddy's Junky Music Stores*, 109 F.3d at 287. "Thus, as with the seventh factor, an affirmative finding will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is *not* a strong indication to the contrary." *Id.*; *Champions Golf Club*, 78 F.3d at 1122.

Neither party suggests plans to compete directly into each other's markets. Accordingly, the Court need not consider this factor.

### 4. Balance of Factors

In weighing the eight factors discussed above, the Court is mindful that "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners*, 931 F.2d at 1107.

Only two factors support finding that Defendant's design is likely to cause confusion among consumers: the strength of Plaintiff's trademark and trade dress, and Defendant's likely intent in designing its "couch bar." On the other hand, the lack of relatedness between the parties' goods and services, the difference in marketing channels used and varying degrees of care purchasers are likely to exercise when buying the parties' products, suggest that consumer confusion is unlikely. The lack of evidence of confusion, as well as the lack of resemblance between the parties' trademarks and trade dresses also weigh against the risk of confusion, albeit more modestly. The last factor has no bearing in this analysis: there is no evidence that the parties intend to extend their businesses to compete with one another.

On balance, the Court finds it unlikely that Defendant's truck design will cause consumers to believe that Art Van is somehow affiliated or associated with Hershey, or that customers will patronize Defendant's stores or purchase its products due to confusion over the source of Defendant's goods. Accordingly, the Court finds that Plaintiff is unlikely to succeed on the merits of its trademark and trade dress infringement claims.

**B.** **Likelihood of Success on the Merits - Unfair Competition Claim**

Plaintiff also alleges unfair competition as defined by 15 U.S.C. § 1125(a). As in trademark infringement claims, likelihood of confusion is the key issue, and the same eight-factor test applies. *See Wynn II*, 943 F.2d at 604 (on review, holding that the district court had correctly found existence of trademark infringement, and thus finding unfair competition was correct as well); *Ford Motor Co. v. Lloyd Design Corp.*, 184 F. Supp. 2d 665, 669 (E.D. Mich. 2002) (applying the eight-factor test to unfair competition claims).

In accordance with its determination on Plaintiff's trademark infringement claims, the Court finds that Plaintiff is unlikely to succeed on its unfair competition claim.

**C.** **Likelihood of Success on Merits - Federal Dilution Claim**

"Dilution law, unlike traditional trademark infringement law . . . is not based on a likelihood of confusion standard, but only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark." *Audi*, 469 F.3d at 547; *see also Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) ("Dilution is a cause of action invented and reserved for a select class of marks - those marks with such powerful consumer associations that even non-competing uses can impinge on their value"). The Federal Trademark Dilution Act ("FDTA") provides:

> the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

§ 1125(c)(1).

The FDTA creates two alternative theories of dilution. Dilution by tarnishment arises when a famous mark becomes associated, for reasons of similarity, with another mark or trade name, causing harm to its reputation. § 1125(c)(1)(C). Dilution by blurring occurs when a famous mark is used or modified to identify goods or services other than its own, thus impairing the mark's distinctiveness and ability to serve as a unique identifier of its products. § 1125(c)(1)(B). This is the type of dilution Plaintiff alleges occurred here.

When assessing whether dilution occurred under the FDTA, the Sixth Circuit applies a five-part test. *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 802 (6th Cir. 2004). Adapted to reflect changes in the FDTA brought by the Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, § 2, 120 Stat. 1730, the test states:

> The senior mark must be both (1) famous; and (2) distinctive. Use of the junior mark must (3) be in commerce; (4) have begun subsequent to the senior mark becoming famous; and (5) [be likely to] cause dilution of the distinctive quality of the senior mark.

*Compare AutoZone*, 373 F.3d at 802 (reciting the five-factor dilution test before the 2006 amendments to the FDTA); *with Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008) (after the 2006 amendments, phrasing the last factor as "the defendant's use of the mark is *likely* to cause dilution by blurring or dilution by tarnishment") (emphasis added).

### a. Famous and Distinctive

"A mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). The FDTA lists four factors to consider in

determining whether a mark possesses the requisite degree of recognition:

1. The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

2. The amount, volume, and geographic extent of sales of goods or services offered under the mark.

3. The extent of actual recognition of the mark.

4. Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Id.*

As discussed earlier, Plaintiff's mark has acquired a secondary meaning in the marketplace. Plaintiff is one of the largest producers of chocolate and confectionery goods, its products are sold around the world and it spends tens of millions of dollars annually to maintain and promote its products. Plaintiff is also protective of its brands and holds hundreds of trademarks, although none specifically covers the trade dress at issue here. These factors, combined with the iconic status of the classic Hershey's bar, prove that Plaintiff's mark is both famous and distinctive.

### b.    Use in Commerce

Defendant does not contest that its "couch bar" design is used in commerce. The design posted on its website is part of a campaign to promote Defendant's products by letting the public choose the design of Defendant's delivery trucks. If Defendant were to proceed with this plan, its trucks would serve two commercial purposes at once: delivering products to customers while advertising Defendant's brand. Thus, this element of the test is met.

### c. Use Began After Plaintiff's Mark Became Famous

There is no dispute that Plaintiff's mark became famous well before September 2008, when Defendant first conceived of its advertising campaign.

### d. Defendant's Use has/has not caused Dilution

In *V Secret Catalogue, Inc. v. Moseley*, the Sixth Circuit endorsed a ten-factor, non-exclusive test developed by the Second Circuit to determine if the distinctive qualities of a mark have suffered dilution. 259 F.3d 464, 476 (6th Cir. 2001) (*citing Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 217-222 (2d Cir. 1999). The ten *Nabisco* factors are:

> distinctiveness; similarity of the marks; proximity of the products and the likelihood of bridging the gap; interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products; shared consumers and geographic limitations; sophistication of consumers; actual confusion; adjectival or referential quality of the junior use; harm to the junior user and delay by the senior user; and the effect of [the] senior's prior laxity in protecting the mark.

*AutoZone*, 373 F.3d at 803-04. After the Supreme reversed *Moseley* on other grounds, 537 U.S. 418 (2003), the Sixth Circuit expressed doubts about the *Nabisco* test's continuing viability and labeled some factors "particularly unhelpful." *AutoZone*, 373 F.3d at 805 (referring to factors measuring proximity of the products, shared consumers and geographic limitations, and actual confusion).

Since *AutoZone*, Congress enacted the Trademark Dilution Revision Act of 2006, by and large expanding trademark protection under the FDTA. Pub. L. No. 109-312, § 2, 120 Stat. 1730. The updated FDTA identifies six non-exclusive factors for courts to consider when analyzing whether a mark or trade name is likely to cause dilution by

blurring.

1. The degree of similarity between the mark or trade name and the famous mark.
2. The degree of inherent or acquired distinctiveness of the famous mark.
3. The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
4. The degree of recognition of the famous mark.
5. Whether the user of the mark or trade name intended to create an association with the famous mark.
6. Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B). Under the test established by the FDTA, the Court finds that a likelihood exists that Defendant's design will cause dilution of Plaintiff's mark.

As discussed in the infringement analysis above, the second, third and fourth requirements of § 1125(c)(2)(B) are easily met. The evidence certainly supports an inference that Defendant intended to "create an association" with Plaintiff's mark (fifth factor), but whether such an association has actually been made is unclear (sixth factor). Finally, Defendant's "couch bar" design, with its stylized block lettering, its packaging in two elements, and especially its silver foil visible beneath the wrapper's sleeve, bears an unmistakable resemblance to some of Plaintiff's candy bars (first factor). *See Jada Toys*, 518 F.3d at 635 (denying summary judgment because a reasonable trier of fact could find that two marks, "Hot Wheels" and "Hot Rigz," were "nearly identical" because both contained the word "hot," were accompanied by a flame, and used similar colors).

Plaintiff sustains its burden to show a reasonable likelihood of succeeding on the merits of its dilution by blurring claim.

**D.    Parody Defense**

In its brief and at oral argument, Defendant relies heavily on the theory that its "couch bar" is merely a "clever parody" of an actual candy bar, and that the amusing nature of the design diffuses any risk that confused consumers would mistake its source or sponsorship.  Defendant emphasizes that this image appears on its website next to nine other "whimsical" pictures, further reinforcing its satirical character.  Defendant's reliance on the parody exception is misplaced.

> For trademark purposes, "[a] 'parody' is defined as a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner."  "A parody must convey two simultaneous -- and contradictory -- messages: that it is the original, but also that it is not the original and is instead a parody."  This second message must not only differentiate the alleged parody from the original but must also communicate some articulable element of satire, ridicule, joking, or amusement.

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260 (4th Cir. 2007) (*quoting People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 366 (4th Cir. 2001)).  In *Louis Vuitton*, the plaintiff sued a maker of pet toys, the names and appearances of which mimicked those of high-end brands.  *Id.* at 258.  The plaintiff took exception to the defendant's "Chewy Vuiton" line of chew toys, which looked like little furry versions of the plaintiff's elegant handbags, complete with a "CV" symbol instead of the signature "LV."  *Id.*  The court dismissed the plaintiff's infringement and dilution claims; there was no mistaking the intentional, yet irreverent nature of the defendant's miniature handbags.  *Id.* at 260-61.

"It is a matter of common sense that the strength of a famous mark allows consumers immediately to perceive the target of the parody, while simultaneously

28

allowing them to recognize the changes to the mark that make the parody funny or biting." *Id.* at 261. Defendant's "couch bar" may be funny, but it is not biting; its resemblance to Plaintiff's famous trade dress is too muted to poke fun, yet too transparent to evoke a generic candy bar.

An important theme running through *Louis Vuitton* is that, while a parody may be nearly identical to the original in some respects, in others it is so different that no one could possibly mistake it for the real thing. *Id.* Defendant's design is neither similar nor different enough to convey a satirical message.

### E.    Irreparable Harm

In trademark infringement cases, a finding of likelihood of confusion often suffices to establish irreparable harm.

> "A finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears." The irreparable injury flows "both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values…."

*Mexican Food Specialties*, 953 F. Supp. at 854 (*quoting Wynn II*, 943 F.2d at 608). In view of the Court's finding that Defendant is likely to succeed on its claims for dilution by blurring, irreparable harm is presumed.

### F.    Potential Harm to Defendant and Others

The parties have not indicated, and the Court has not identified any third party who might be harmed by the granting of an injunction. The public is free to continue patronizing Defendant's showrooms and its website, and to stockpile Plaintiff's products in anticipation of Halloween.

The potential harm of an injunction to Defendant is limited, and certainly not

irreparable. Removing the "couch bar" design from Defendant's website will not spell the end of its contest or its advertising campaign; nine other designs remain for visitors to choose from. Finally, Defendant has already decided to put its truck decorating plans on hold pending resolution of this case.

### G. The Public Interest

Reducing the risk of customer confusion inherently serves the public interest. A free market society depends on informed consumers for its well-being, and "[t]rademark infringement, by its very nature, adversely affects the public interest in the 'free flow' of truthful commercial information." *Mexican Food Specialties*, 953 F. Supp. at 854 (*quoting Gougeon Brothers, Inc. v. Hendricks*, 708 F. Supp. 811, 818 (E.D. Mich. 1988)).

### H. Weighing the Equities

The balance of equities tilts in favor of enjoining Defendant from continuing its online advertising campaign. Defendant presents no evidence that the granting of an injunction will result in substantial harm to itself or to third parties.

## IV. CONCLUSION

The Court **GRANTS** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. Defendant is enjoined from continuing to display the "couch bar" design on its website, and must remove it immediately. Further, because Defendant represented to the Court that it would not display the "couch bar" design on its trucks, pending the outcome of this litigation, the Court does not need to address that part of Plaintiff's request.

Plaintiff stated at oral argument that since the only thing at issue is the display of the "couch bar" on Defendant's website, its damages – if any – are nominal.  For this reason, no bond is required.  *See* Fed. R. Civ. P. 65(c); *Boyd County High School Gay Straight Alliance v. Board of Education*, 258 F. Supp. 2d 667, 693 (E.D. Ky. 2003).

**IT IS ORDERED.**

**s/Victoria A. Roberts**
**Victoria A. Roberts**
**United States District Judge**

**Dated:  October 24, 2008**

| |
|---|
| **The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on October 24, 2008.** <br><br> **s/Linda Vertriest** <br> **Deputy Clerk** |